## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

| | | |
|---|---|---|
| **ALTE VOLANT, LLC** | § | |
| | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **Civil Action No.** |
| | | _____ |
| | § | |
| **PIPER AIRCRAFT, INC.** | § | |
| | § | |
| | § | |
| **Defendant.** | § | |

## PLAINTIFF'S ORIGINAL COMPLAINT

ALTE VOLANT LLC ("AV" or "Plaintiff") files this Original Complaint complaining of PIPER AIRCRAFT, INC. ("Piper") and would show the Court as follows:

### I.
### STATEMENT OF THE CASE

1.      AV is the owner of a 2020 Piper Aircraft 46-600TP, Serial No. 4698141 (N64WA) (the "Aircraft"). On January 19, 2021, the Aircraft was piloted by Greg Mallo ("Mallo") and involved in an incident at Manchester-Boston Regional (KMHT) when at touchdown of the nose landing gear the Aircraft veered hard to the right. In response, Mallo used the left rudder pedal

to counter the un-commanded right turn, the Aircraft then veered left, did not respond to input, and skidded off the runway causing substantial damage to the Aircraft (the "Incident"). There was no ice on the runway or any other weather-related conditions that contributed to the Incident. The Incident and Plaintiff's damages were caused by a defect(s) in the Aircraft's nose landing gear and/or steering system, which Piper was aware of before the Incident and before AV purchased the Aircraft.

2.      The Incident and the issues with Piper's M600 were not limited to the Aircraft. There have been several similar incidents caused by the same defect(s) in the same model Piper M600 aircraft. Several experienced pilots – and even a Piper pilot – have encountered the same scenario as Mallo when landing M600s and experienced runway excursions. As one NTSB investigator said before the Incident, "Piper knows they have a problem."

3.      Despite knowing the defect(s) existed, Piper failed to disclose and correct the defect before AV purchased the Aircraft and before the Incident. Piper also failed to warn AV and Mallo about the risk created by the defect(s), including the life and safety risks presented by the defective nose landing gear/steering system and possible resulting runway excursions during otherwise routine landings. Both before and after the Incident, Piper took several half-measures to try to correct the defect(s) in the Aircraft, but

they failed. These efforts were insufficient and ultimately failed until Piper completely redesigned the nose-landing gear and steering components in its M600.

4.      Several experts and engineers have investigated the numerous M600 excursions and collected relevant data to identify the defect(s) in the M600 that caused the Incident and similar incidents. It is clear there was a critical issue with the nose landing gear and steering system of M600s that suffered runway excursions, including the Aircraft. Plaintiff's investigation supports that a defect(s) and/or mechanical malfunction of the Aircraft's nose landing gear/steering system caused the Incident and AV's damages. The NTSB also determined that the design of the nose landing gear was prone to dynamic instability during landings, causing the several runway excursions experienced by M600 owners and pilots, including AV and Mallo.

5.      For these reasons, Plaintiffs seek damages of more than $1,000,000 from Piper under several causes of action, outlined below, which were the direct result of and were proximately caused by the defects present in the Aircraft.

## II.
## PARTIES

6.     Plaintiff Alte Volant LLC is an Oregon limited liability company with its mailing address set in Hillsboro, Oregon and its sole member being domiciled in Hillsboro, Washington County, Oregon.

7.     Defendant Piper Aircraft is a Delaware Corporation engaged in and doing business in all states across the United States and internationally, including the state of Florida. Piper's principal place of business is located at 2926 Piper Drive, Vero Beach, Indian River County, Florida 39260. Piper is a citizen of Delaware and Florida. Piper may be served with process through its registered agent, Kevin Keegan, 2926 Piper Dr., Vero Beach, Florida 32960.

### III.
### JURISDICTION AND VENUE

8.     The Court has jurisdiction over this lawsuit because there is complete diversity between the parties, as Plaintiffs are citizens of a different state than Piper and the damages in controversy are within the jurisdiction limits of this Court. 28 U.S.C. § 1332(a)(1).

9.     The Court has jurisdiction over this lawsuit and venue is proper in this Court pursuant to a forum selection clause that requires this litigation to be brought in the Southern District of Florida.

10.     This court has *in personam* jurisdiction over Piper. Piper is a citizen of Florida and maintains systematic and continuous contacts with Florida.

## IV.
### CONDITIONS PRECEDENT

11.     All conditions precedent have been performed or have occurred permitting this matter to go forward. AV made demand on Piper and provided notice of the defects in the Aircraft and the damages suffered as a result of the defects during the Incident.   Despite demand and the defects, Piper refused to meet its warranty obligations and/or accept any liability for the Incident or AV's damages.

## V.
### FACTS

12.     On November 29, 2020, AV purchased the Aircraft from Western Aircraft, Inc. At that time, neither Piper nor Western Aircraft, Inc. disclosed any defect(s) in the Aircraft. Neither Piper nor Western Aircraft, Inc. disclosed any of the runway excursions that had occurred in similar M600s before or at the time AV purchased the Aircraft.

13.     At the time AV purchased the Aircraft, Piper was aware of the defect(s) in the nose landing gear and steering system of its M600 model,

including the Aircraft, and the potential for the defects to cause runway excursions during landings. Piper learned about the defect(s) firsthand, at the latest, when its own pilot suffered a runway excursion in a M600 (N115NX) at Johnson County Executive Airport (KS)(OJC) in December 2019. According to a description of the Piper incident, upon touchdown of the nose landing gear, the M600 veered immediately to the right, traversed the infield, and came to rest on an adjacent taxiway. It is unclear whether Piper reported this incident to the NTSB and/or the FAA. The Piper incident was a nearly a full year before AV purchased the Aircraft. Piper failed to disclose its runway excursion and the known defect(s) to potential buyers of the M600 before AV purchased the Aircraft or to stop the sale of M600s until the defect was corrected.

14.    Piper had even more evidence of the defect(s) in the M600 before AV purchased the Aircraft and the Incident because Piper was alerted to at least three additional and similar runway excursions and two near excursions that involved the defect(s) in the nose landing gear before AV purchased the Aircraft. There was another M600 excursion immediately after AV purchased the Aircraft. Again, Piper failed to disclose this information to either Mallo or AV before AV purchased the Aircraft and before the Incident.

15.     Moreover, it is likely Piper knew about the defects in the M600 before it was released for sale to the public, and before any actual M600 excursion. The M600 is a derivative of a prior Piper model, the Piper Meridian. The Piper Meridian fleet had a well-documented history of runway excursions. In fact, due to an alleged runway excursion rate of 7.6% for the Piper Meridian, Piper publicly acknowledged the issue to its customers in March 2008. Piper had been trying to correct the nose landing gear issues in the Meridian since at least 2002, when it issued service bulletin No. 1106. However, it is clear based on its March 2008 letter to its customers, Piper did not correct the issue in the Piper Meridian. The M600 is a heavier and more powerful aircraft than the Piper Meridian. This extra weight and extra power likely only exacerbated the defect(s) or insufficient design of the M600 nose landing gear and steering system.

16.     Rather than stop the sale of the Piper M600 until the defect(s) could be corrected and warn current owners, Piper continued to sell the M600 and marketed it as an advanced and safe airplane. Ironically, Piper's M600 tagline is—Safety, Luxury and Support. Given the known issues in the Aircraft, and Piper's omission and failure to warn about the defect(s) and excursions, this marketing is misleading and false.

## THE INCIDENT

17.    On January 18, 2020, Mallo was scheduled to depart in the Aircraft on a two-leg cross county trip from Lincoln, CA to Manchester, NH with his wife. The trip was delayed approximately 50 minutes because when Mallo checked the tire pressure of the main landing gear, he discovered that the left main landing gear tire valve stem was inaccessible due to the hub cap being installed incorrectly. A local A&P Service Center, Lincoln Skyways, Inc., corrected the issue and confirmed the POH air pressure requirements were met before takeoff. The taxi, take off, landing, and post landing taxi phases of the first leg were typical and uneventful.

18.    On January 19, 2020, Mallo departed New Century Air Center (KIXD) for a flight to Manchester-Boston Regional Airport (KMHT). Before takeoff, Mallo again checked the tire pressures during the pre-flight inspection. Taxi and takeoff were normal. The trip was uneventful. Following the approach, the main landing gear touched down with the Aircraft near center line just beyond the extended threshold. The Aircraft responded as expected upon main landing gear touchdown. When the nose landing gear touched down the Aircraft immediately felt unstable and uncontrollable. The Aircraft then veered hard to the right. In response, Mallo used the left rudder pedal to counter the un-commanded right turn and the Aircraft veered left but

it did not respond to Mallo's input and skidded off the runway. During the Incident, the nose landing gear collapsed while the engine was still running and dropped the spinning prop to the ground. The prop was immediately obliterated. The turbine engine abruptly quit running.

19.    Mallo was surprised by the Incident, including the sudden un-commanded right turn and the failure of the Aircraft to respond to his input. Initially, Mallo could only assume that he had hit ice on the runway when landing, due to the unresponsive controls of the Aircraft. Mallo reported this belief to the airport tower. However, an inspection of the runway by the airport and Mallo after the Incident confirmed there was no ice or snow on the runway at the time of the Incident. The NTSB report for the Incident states clearly that there was no precipitation or ice present at the time of the Incident. The Incident was not caused by weather conditions.

20.    Piper has previously implied that tire pressure was the cause of the Incident. There was no issue with the Aircraft's tire pressure or a flat tire on any of the tires of the Aircraft at the time of the Incident.



21.    There was also no evidence of any pilot error by Mallo during the Incident, including any error in his response to the Incident, his aeronautical decision making or failure to comply with any applicable regulation. Mallo did not lose control of the Aircraft and executed a proper landing and made correct inputs during landing and in response to the Incident. Mallo is an experienced pilot with over 25 years of pilot experience and has piloted several different aircraft without any other incident or issue.

22.    The Incident was caused by the dynamic instability of the nose landing gear/steering system of the Aircraft due to a known defect(s) that Piper failed to report and correct before the Incident. The Aircraft's mechanical failure could not be overcome before the runway departure and its was the defect(s) in the Aircraft that caused the Incident and AV's damages.

**Piper Could Have Prevented the Incident**

23.    After Piper's runway excursion in December 2019, Piper took some half measures to investigate the issues with the nose landing gear defect(s). Piper issued several safety bulletins allegedly aimed at correcting or limiting the impact of the defects.

- On July 24, 2020, Piper issued Service Letter No. 1285. Under the Maintenance Alert pilots were required to check their M600's tire pressure "prior to first flight each day." This is an unusual requirement and does not address the defect(s) or the cause of the Incident.

- On August 18, 2020, Piper was forced to issue Service Letter No. 1286, requesting owners to have their M600's ground steering system components inspected in the next 50 hours and every 100 hours thereafter. This was an obvious attempt by Piper to get the M600s back into maintenance so that nose landing gears and rake angles could be inspected. It also shows that Piper knew that tire pressure alone was not the cause of the M600 excursions.

24.    Piper's attempt to blame the excursions on tire pressure was all but debunked after the December 6, 2020, excursion involving M600 tail number 282ST.  This excursion, at that time the fifth known excursion of an M600, caught the NTSB's attention and sparked an obvious shift within the NTSB's investigation of the M600 excursions. In response, Piper issued Service Bulletin 1350 on December 17, 2020, for a nose landing gear steering horn and arm assemblies inspection. Piper considered compliance <u>mandatory</u>. Piper then issued an amended/supplemental version of Service Letter No. 1285 on January 12, 2021, which was followed up with Service Letter No. 1360A on January 13, 2021, for aileron drive sector inspections – which Piper also made <u>mandatory</u>.

25.    After the Incident, Piper issued Service Letter Nos. 1286A and 1286B on January 21 and 28, 2021, to further expand on inspections for the nose landing gear steering horn and arm assemblies. But Piper was forced to issue a Service Bulletin 1350A on February 10, 2021, making the inspections <u>mandatory.</u> On March 24, 2021, Piper again issued an

amended/supplemental version for the inspections with Service Letter 1286C. Piper issued Service Letter 1285B, an amended/supplemental letter related to proper tire pressure maintenance. Piper's service letters and bulletins make clear that there was a defect in the Aircraft and the time of the Incident. None of these efforts made any real difference and did not correct the defect(s) in the M600.

26.     On February 4, 2021, after 6 runway excursions since December 2019, Piper issued a letter to M600 owners seeking to squash any notion that the several runway excursions, including the Incident, were caused by a defect(s) in the M600. In the letter, Piper took several liberties with the facts about the incidents and insinuated that there were no issues with the M600 at all. Piper blamed pilots, insinuated failures in pre-flight inspections, blamed tire pressure, and landing techniques. Ironically, Piper ignored its own excursion, presumably which did not include any of the list of Piper's excuses. Piper took no accountability for any of the incidents and stated that there was no "known" defect in the Aircraft. The word "known" is important because the fact that Piper noted that it was spending 1000s of hours trying to find the cause of the runway excursions and that it hired a third-party to find the defect, is a strong indication that a defect was present, it just was

not known. Piper knew it had an issue, it just did not know what it was or was unwilling to admit or fix the problem.

27.     As it relates to the Incident, Piper alleged that the Aircraft's main landing gear had a flat tire, and that ice and snow were a concern at the time of the Incident. Both allegations are false. Mallo and the airport investigators confirmed there was no snow or ice on the runway. As shown in the photos above, there was no flat tire on the Aircraft at the time or even after the Incident:

28.     Piper's efforts to take half measures and make excuses for the excursions did not correct the defect(s) in the M600. Runway excursions continued to happen, ultimately prompting Piper to completely redesign the nose landing gear in the M600.

29.     Despite Piper's efforts to deflect and conceal the cause, the Incident was caused by one or more defects present in the Aircraft before it was purchased. As illustrated by the above photos, the Incident caused substantial damage to the Aircraft, which required repair, loss of use of the Aircraft and depreciated the value of the Aircraft. The repair costs alone were $533,294.02, plus an additional $21,000 to replace the nose landing gear. Mallo and AV also suffered a substantial loss in value to the Aircraft, exceeding $300,000 caused by the Incident. Mallo and AV also lost use of

the Aircraft while it was being repaired, an additional damage suffered by AV. The Incident has also caused severe emotional distress for Mallo, which still impacts him today. Finally, AV has been forced to report the not-at-fault incident on its insurance applications, causing it to be unable to or to overpay for insurance on the Aircraft. All these damages were caused by Piper and the defect(s) in the Aircraft.

## VI.
## CAUSES OF ACTION

### COUNT 1:  NEGLIGENCE AND GROSS NEGLIGENCE

30.    AV incorporates by reference herein all prior and subsequent allegations in this pleading, as though fully set forth herein.

31.    Piper owed AV a legal duty to use reasonable care in the design, manufacture, service, distribution, marketing, and sale of the Aircraft.

32.    Piper also owed a duty to warn AV and Mallo of the defects it knew or should have known existed in the Aircraft at and before the time it was sold to AV. More especially, Piper had notice of defects in the Aircraft's nose landing gear and steering components that required Piper to use special care to identify and correct the defects existing in the Aircraft, both prior to its sale and before the Incident.

33.    Piper had a duty to use reasonable care in the service, alteration, or modification of the Aircraft once the defect(s) was identified and was

required to act in a manner that would correct those defects before the Aircraft was sold to Plaintiffs and before the Incident.

34.    Piper breached these duties when it:

a.  Failed to correct the known defect(s) in the Piper M600 and used known defective components.

b.  Failed to properly correct the defect(s) in the Aircraft and to prevent runway excursions when discovered in or before December 2019.

c.  Failed to warn AV and Mallo about the defect(s) in the Aircraft.

d.  Failed to correct the known defects, and despite knowing the substantial risk of harm posed by the defect(s) in the Aircraft, Piper intentionally and/or negligently chose not to disclose the defect(s) to AV and negligently and gross negligently failed to warn AV about the unreasonably dangerous defect(s) in the Aircraft.

e.  Failed to provide a properly functioning and performing Aircraft, without a defective nose landing gear and/or steering components.

f.  Failed to properly install components of the nose landing gear and/or steering components in the Aircraft.

g.  Failed to install adequate safety features to overcome the risk posed by the defect(s) or manufacturing defects in the Aircraft.

h.  Marketed, sold, and placed the defective Aircraft in the stream of commerce.

i.  Represented that tire pressure was the cause of runway excursions, when it knew that the Aircraft contained one or more defects in the design or manufacturing of the Aircraft.

j.  Represented that the Aircraft was safe when it knew that it contained defect(s) that could lead to accidents, damages, and personal injury or death.

k.  Failed to notify the NTSB, FAA, and its owners that the defect(s) existing in the M600, and that the Aircraft should not be flown until corrected.

l.  Withheld relevant information about the Aircraft that increased the risk of harm, potential for damages or severe injury/death to pilots and passengers.

35.   Piper's actions were willful, reckless, and grossly negligent in that it knew of the defect(s) and concealed vital information about the defects and risks posed by same before and after the Aircraft was sold, showing a

conscious indifference to the life and safety of AV, Mallo, and the public as a whole.

36.    Piper's breach of these duties was the actual and proximate cause of AV's damages.

## COUNT 2:  STRICT PRODUCT'S LIABILITY – 402A

37.    Plaintiff incorporates by reference herein all prior and subsequent allegations in this pleading, as though fully set forth herein.

38.    Piper is liable for strict products liability under Section 402A of the Restatement (Second) Torts. Piper is engaged in the business of manufacturing, servicing, selling, altering, designing, and distributing the Aircraft and its components. Piper expected and knew that the Aircraft and its components would be delivered to consumers like AV without substantial change in the condition in which it was sold. The condition of the Aircraft and its components, at the time it was sold and the Incident, was defective and unreasonably dangerous as sold and/or modified/altered by Piper. The defect(s) caused AV's damages.

39.    Piper is liable to AV because it failed to use reasonable care in the design, manufacture, marketing, sale, and service of the Aircraft. At the time the Aircraft was sold and/or delivered to Plaintiffs the Aircraft contained one or more design or manufacturing defects related to the nose landing

gear and steering system, which caused the Airplane to violently veer off the runway upon touchdown of the nose landing gear, causing the Incident and AV's damages.

40.    AV is seeking to recover damages from Piper under a theory of strict liability because:

      a.  The defect(s) in the Aircraft's steering components and nose landing gear existed at the time the Aircraft was sold to AV;

      b.  The defect(s) existed when the Aircraft and its components were distributed;

      c.  Piper knew about the defect(s), but failed to warn AV;

      d.  The defect(s) in the Aircrafts steering components and nose landing gear were the proximate and direct cause of the Incident and resulted in an unreasonably dangerous condition that caused the Incident.

      e.  The Aircraft was defective in that Piper admits that even a slight change in tire pressure in the nose landing gear tire can cause an excursion and plane accident;

      f.  Piper failed to properly test the Aircraft before it was sold;

      g.  Piper failed to correct known defect(s) in the Aircraft before it was sold;

h.  Piper knew about the significant danger in the Aircraft and the risk of harm the defects in the Aircraft posed, but failed to warn or notify AV or any relevant authorities about the issues in the Aircraft;

i.  Piper failed to provide proper or adequate instructions or warnings to Mallo or AV about how to reduce the risk of harm posed by the defect(s);

j.  Piper failed to install safety features or components that would reduce the risk of harm posed by the defect(s) and/or have prevented the Incident;

k.  Piper failed to use safer alternative designs and manufacturing processes that were feasible, available, and would have eliminated or reduced the risk of harm posed by the defect(s);

l.  Piper installed dangerous, defective, or deficient components in the Aircraft nose wheel landing gear and steering system that caused the Incident;

m. Piper negligently installed components in the Aircraft's nose landing gear in a way that made the Aircraft unreasonably dangerous and caused the Incident;

n. Piper installed dangerous, defective, and deficient components in the Aircraft's steering system that caused the Incident;

o. Piper negligently installed components in the Aircraft's steering system in a way that made the Aircraft unreasonably dangerous and caused the Incident;

p. Piper used negligent and inadequate installations protocols to identify, correct, and or prevent the defect(s) in the Aircraft;

41.    The defect(s) that existed when the Aircraft left their possession and was sold to AV rendered the Aircraft unreasonably dangerous. The Aircraft failed to perform as safely as an ordinary consumer would expect and was being used for its intended purpose and a reasonable manner as would be expected by Piper.

42.    The defect(s) in the Aircraft caused the Incident and AV's damages.

## COUNT 3: BREACH OF EXPRESS WARRANTY

43.    AV incorporates by reference herein all prior and subsequent allegations in this pleading, as though fully set forth herein.

44.    Piper made express warranties about the safety and safety features of the Aircraft.

45.     Piper claims that it made a limited warranty for the Aircraft, however, the document purporting to be a limited warranty does not contain any warranty by Piper at all. Rather, it is just a series of limitations that do not create an express warranty or provide any warranty to AV. The Piper limited warranty fails in its essential purpose and is unenforceable because it lacks consideration and appears to have no purpose other than to limit when and how a purchaser may hold Piper accountable for known defects. Additionally, because Piper knew of the defects in the Aircraft at the time of the sale, any limited warranty it made would have been made under a cloud of fraud and with the intent of inducing AV to agree to a limited warranty that Piper had already knowingly breached. Therefore, the limited warranty is illegal, unconscionable, and unenforceable to limit AV's remedies in this case and cannot prevent AV from enforcing all remedies available under the common law and Universal Commercial Code.

46.     Piper's express warranties regarding the safety of the Aircraft were made with the intention of inducing a part of the bargain between the parties.

47.     Piper breached the express warranties it made regarding the Aircraft, as the Aircraft contained defect(s) and inherently dangerous

conditions and Piper knew of the defects in the Aircraft when the express warranties were made.

48.    Piper's breaches of express warranties were the cause of AV's damages.

## Count 4: Breach of Piper's Limited Warranty

49.    AV incorporates by reference herein all prior and subsequent allegations in this pleading, as though fully set forth herein.

50.    Piper warranted the Aircraft to be free from defects;

51.    Piper breached its limited warranty because the Aircraft was defective at the time it was sold and at the time of the Incident;

52.    Piper failed to perform under its limited warranty, as it was given notice of the defects, the Incident and AV's damages but refused to meet its obligations under its warranty.

53.    Piper's breach of its limited warranty caused Plaintiff's damages.

## COUNT 5: FRAUD

54.    AV incorporates by reference herein all prior and subsequent allegations in this pleading, as though fully set forth herein.

55.    Piper committed fraud and fraudulently induced AV into purchasing the Aircraft when the made false representations or omitted facts about the Aircraft, including its failure to disclose known defect(s) and runway

excursions before AV purchased the Aircraft. Prior to AV's purchase, Piper made numerous misrepresentations to AV about the Aircraft's safety and performance with the intent of inducing AV into purchasing the Aircraft. When Piper made these false statements, it knew that the Aircraft contained dangerous defect(s) that made the Aircraft unsafe and purposely withheld this information to complete the sale of the Aircraft. Piper committed fraud by omission when it intentionally failed to disclose knowledge of the defects in the Aircraft.

56.    Piper's representations and omissions were false and were made knowingly, or with reckless disregard for their truth. Piper made the representations with the intent that AV act on them, which AV did rely on the misrepresentations and fraudulent omissions to their detriment. Piper's conduct proximately caused AV's damages.

## VII.
## RELIEF REQUESTED AND DAMAGES

57. AV seeks money damages in an amount of more than $1,000,000.  AV also seeks the following:

      i.   Prejudgment and post-judgment interest;

      ii.   Actual and consequential damages, and/or lost profits;

      iii.   Reasonable attorneys' fees;

      iv.   Court costs; and

v.    All other relief to which Plaintiff is justly entitled.


## VIII.
### <u>JURY DEMAND</u>

AV demands a trial by jury pursuant to Federal Rule of Civil Procedure 38 on all issues in this matter.

### <u>Note Regarding Subrogation</u>

A portion of AV's claim is made on behalf of its insurer, Harco National Insurance Company, based on payments made to repair damages caused by Piper and the Incident.


### <u>PRAYER</u>

**WHEREFORE, PREMISES CONSIDERED**, Plaintiffs pray for the following:

- AV be awarded the damages identified and pled above;

- Reasonable attorneys' fees through trial and subsequent appeal;

- All costs of court;

- Pre- and post-judgment interest at the maximum statutory rate allowed by law on the total amount of the Judgment from the date of Judgment until paid; and

- Such other and further relief, special and general, legal, or equitable, as AV may be justly entitled to receive.

Dated: January 15, 2024.

**LEVY LAW GROUP**

/s/ Lauren D. Levy
LAUREN D. LEVY, ESQ.
Florida Bar No.:  0116490
lauren@levylawgroup.com
elizabeth@levylawgroup.com
lisa@levylawgroup.com
3399 Ponce de Leon Blvd., Suite 202
Coral Gables, Florida 33134
Telephone: (305) 444-1500
Facsimile:  (305) 503-9295
**ATTORNEY FOR PLAINTIFF**
